IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 19-cv-4657 |
| | ) | |
| CLEAN HARBORS RECYCLING SERVICES | ) | |
| OF CHICAGO, LLC, and | ) | |
| CLEAN HARBORS RECYCLING SERVICES | ) | |
| OF OHIO, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

The United States of America, by the authority of the Attorney General and through the

undersigned attorneys, acting at the request and on behalf of the Administrator of the United

States Environmental Protection Agency ("EPA"), files this complaint and alleges as follows:

## NATURE OF ACTION

1.     This is a civil action against Clean Harbors Recycling Services of Chicago, LLC

("Clean Harbors Chicago") and Clean Harbors Recycling Services of Ohio, LLC ("Clean

Harbors Ohio") (collectively "Defendants") for civil penalties and injunctive relief as a result of

violations of the Clean Air Act, as amended ("CAA"), 42 U.S.C. §§ 7401 *et seq*., including the

regulations promulgated thereunder known as the National Emission Standards for Hazardous

Air Pollutants ("NESHAP") found at 40 C.F.R. Part 63, Subparts A, H, DD, and OO; and 40

C.F.R. Part 61, Subpart V.  This action is based on violations that occurred at the treatment,

storage, and disposal facilities owned and operated by Clean Harbors Chicago and Clean Harbors Ohio and located in Chicago, Illinois, and Hebron, Ohio, respectively.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. §§ 1331, 1345, and 1355; and Section 113(b) of the CAA, 42 U.S.C. § 7413(b).

3.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1395 and Section 113(b) of the CAA, 42 U.S.C. § 7413(b).

## NOTICE

4.      The United States has provided notice of the commencement of this action to the States of Illinois and Ohio as required by Section 113(b) of the CAA, 42 U.S.C. § 7413(b).

## AUTHORITY

5.      The United States Department of Justice has authority to bring this action on behalf of the Administrator of the EPA under 28 U.S.C. §§ 516 and 519 and Section 305(a) of the CAA, 42 U.S.C. § 7605(a).

## DEFENDANTS

6.      Clean Harbors Chicago is a limited liability company formed under the law of the State of Delaware and does business in the State of Illinois.

7.      Clean Harbors Chicago owns and operates a treatment, storage, and disposal facility located at 1445 West 42nd St., Chicago, Illinois (the "Chicago Facility").

8.      Clean Harbors Ohio is a limited liability company formed under the law of the State of Delaware and does business in the State of Ohio.

9.      Clean Harbors Ohio owns and operates a treatment, storage, and disposal facility located at 581 Milliken Dr., Southeast, Hebron, Ohio (the "Hebron Facility").

10.     Each of the Defendants is a "person" within the meaning of Sections 113(b) and 302(e) of the CAA, 42 U.S.C. §§ 7413(b) and 7602(e).

## CLEAN AIR ACT

## I.     STATUTORY AND REGULATORY BACKGROUND

11.     The Clean Air Act establishes a regulatory scheme designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population.  42 U.S.C. § 7401(b)(1).

### A.     National Emission Standards for Hazardous Air Pollutants

#### 1.     General

12.     Section 112 of the Clean Air Act sets forth a national program for the control of hazardous air pollutants ("HAPs").  42 U.S.C. § 7412.  As originally promulgated in the Clean Air Act Amendments of 1970, Section 112 directed EPA to publish a list of HAPs.  A HAP was defined as "an air pollutant to which no ambient air quality standard is applicable and which in the judgment of the Administrator may cause, or contribute to, an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness."  42 U.S.C. § 1857c-7 (1971).  At that time, Congress directed EPA to establish HAP standards that provided "an ample margin of safety to protect the public health from such hazardous air pollutant."  *Id.*

13.     Between 1970 and 1990, EPA listed eight substances as hazardous air pollutants and promulgated emission standards for seven of them.  H.R. Rep. No. 101-490, 101st Cong., 2d Sess., pt 1 at 151 (1990).  Of relevance to this action, EPA issued standards relating to volatile hazardous air pollutants from equipment leaks, found in Title 40 of the Code of Federal Regulations, Part 61, Subpart V.  40 C.F.R. §§ 61.240–61.247.

14.     Through the Clean Air Act Amendments of 1990, Congress replaced the then-existing Section 112 and established a new program for the control of HAPs.  H.R. Rep. No. 101-490, 101st Cong., 2d Sess., pt 1 at 324 (1990).  The regulations then in existence under the original Section 112 remained in full force and effect.

15.     With the 1990 amendments, Congress itself established a list of 188 hazardous air pollutants believed to cause adverse health or environmental effects.  42 U.S.C. § 7412(b)(1).

16.     Congress directed EPA to publish a list of all categories and subcategories of, *inter alia*, major sources of HAPs.  42 U.S.C. § 7412(c).

17.     "Major source" was and is defined as any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any HAP or 25 tons per year or more of any combination of HAPs.  42 U.S.C. 7412(a)(1).

18.     "Stationary source" was and is defined as any building, structure, facility, or installation which emits or may emit any air pollutant.  42 U.S.C. § 7412(a)(3) (stating that "stationary source" under Section 112(a) has the same meaning as that term has under Section 111(a) of the CAA, 42 U.S.C. § 7411(a)(3)).

19.     A "category" of sources is a group of sources having some common features suggesting that they should be regulated in the same way and on the same schedule.  57 Fed. Reg. 31576, 31578 (July 16, 1992).  A single stationary source can be comprised of multiple source categories.  *Id*.

20.     Congress directed EPA to promulgate regulations establishing emission standards for each category or subcategory of, *inter alia*, major sources of HAPs.  42 U.S.C. § 7412(d)(1).  These emission standards must require the maximum degree of reduction in emissions of HAPs

that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for the new or existing sources in the category or subcategory to which the emission standard applies. 42 U.S.C. § 7412(d)(2).

21.     To the extent that it is not feasible to prescribe or enforce an emission standard for control of a HAP, Congress authorized EPA to promulgate "design, equipment, work practice, or operational" standards, which are to be treated as emission standards. 42 U.S.C. § 7412(h).

22.     The emission standards promulgated under the 1990 Amendments to CAA Section 112, 42 U.S.C. § 7412, are known as the National Emission Standards for Hazardous Air Pollutants ("NESHAPs") for Source Categories or "MACT" ("maximum achievable control technology") standards. These emission standards are found in Part 63 of Title 40 of the Code of Federal Regulations.

23.     After the effective date of any emission standard, limitation, or regulation promulgated pursuant to Section 112 of the CAA, no person may operate a source in violation of such standard, limitation, or regulation. 42 U.S.C. § 7412(i)(3).

## 2.     *General Provisions of the MACT – Part 63, Subpart A*

24.     Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, EPA has promulgated regulations that contain general provisions applicable to sources that are subject to MACT standards. 40 C.F.R. Part 63, Subpart A, §§ 63.1–63.16.

25.     Under Subpart A, the provisions of 40 C.F.R. Part 63 "apply to the owner or operator of any stationary source that (i) emits or has the potential to emit any hazardous air pollutant listed in or pursuant to section 112(b) of the Act; and (ii) is subject to any standard,

limitation, prohibition, or other federally enforceable requirement established pursuant to this part." 40 C.F.R. § 63.1(b)(1).

26.     Under Subpart A, at all times, including periods of startup, shutdown, and malfunction, an owner or operator must operate and maintain any affected source, including associated air pollution control equipment and monitoring equipment, in a manner consistent with safety and good air pollution control practices for minimizing emissions.  40 C.F.R. § 63.6(e)(1)(i).  This standard is sometimes referred to as the "good air pollution control practices" standard.

27.     Each standard in Part 63 must identify explicitly whether each provision in Subpart A, including the good air pollution control practices standard, is or is not included in the standard.  40 C.F.R. § 63.1(a)(4)(i).

### 3.     *Off-Site Waste and Recovery Operations MACT – Part 63, Subpart DD*

#### a.     *General*

28.     Pursuant to Section 112(c) of the CAA, 42 U.S.C. § 7412(c), EPA identified off-site waste and recovery operations as a category of sources of HAPs.  57 Fed. Reg. 31591 (Table 1) (July 16, 1992) (identifying the category as "Solid Waste Treatment, Storage, and Disposal Facilities (TSDF)"); 59 Fed. Reg. 51918 (Oct. 13, 1994) (changing the name of the category to "Off-Site Waste and Recovery Operations").

29.     Pursuant to Section 112(d) of the CAA, 42 U.S.C. § 7412(d), EPA promulgated the National Emission Standards for Hazardous Air Pollutants from Off-Site Waste and Recovery Operations at 40 C.F.R. Part 63, Subpart DD.  40 C.F.R. §§ 63.680 – 63.697.  These regulations are commonly referred to as the "OSWRO MACT" or "Subpart DD."

30.    The OSWRO MACT applies to the owner and/or operator of a plant that is a major source of HAPs when the plant is the location of a waste management operation that receives off-site material and the operation is regulated as a hazardous waste treatment, storage, and disposal facility under either 40 C.F.R. Part 264 or 265.  40 C.F.R. § 63.680(a)(1), (2).

31.    A "waste management operation" is the collection of off-site material management units, process vents, and equipment components used at a plant site to manage an off-site material stream from the point-of-delivery to the point where the waste exits or is discharged from the plant site or the waste is placed for on-site disposal in a unit not subject to Subpart DD.  40 C.F.R. § 63.681.

32.    The "affected source" to which the OSWRO MACT applies is, *inter alia*: (1) equipment leaks, *id.* § 63.680(c)(3); and (2) the entire group of off-site material management units associated with the operation, which units include tanks, *id.* § 63.680(c)(1).

33.    Equipment means a pump, compressor, agitator, pressure relief device, sampling connection system, open-ended valve or line, valve, connector, or instrumentation system that contains or contacts off-site material having a total HAP concentration equal to or greater than 10 percent by weight and is intended to operate for 300 hours or more during a calendar year in off-site material service.  *Id.* § 63.680(c)(3)(i)–(iii).

34.    A tank is a stationary unit that is constructed primarily of nonearthen materials (such as wood, concrete, steel, fiberglass, or plastic) which provide structural support and is designed to hold an accumulation of liquids or other materials.  *Id.* § 63.681.

35.    The OSWRO MACT establishes general standards for owners and operators of affected sources, *id.* § 63.683, as well as specific standards for several sources of potential

emissions from those operations, including equipment leaks, *id*. § 63.691, and tanks,

*id*. § 63.685.

36.     The "good air pollution control practices" standard at 40 C.F.R. § 63.6(e)(1)(i) is

applicable to sources subject to the OSWRO MACT.  40 C.F.R. Part 63, Subpart DD, Table 2.

### *b.     Equipment Leak Standards of the OSWRO MACT*

37.     Owners and operators of equipment subject to the OSWRO MACT must

implement the leak detection and control measures found in the OSWRO MACT at 40 C.F.R.

§ 63.691.  *Id*. § 63.683(d).

38.     Under 40 C.F.R. § 63.691, owners and operators of equipment subject to leaks

may choose among two options for compliance.  *Id*. § 63.691(b).  They may comply with the

equipment leak standards of either 40 C.F.R. Part 63, Subpart H (40 C.F.R. §§ 63.162–63.182) or

Part 61, Subpart V (40 C.F.R. §§ 61.242–61.247).  For purposes of the claims in this Complaint,

the relevant requirements of each of these Subparts are the same.

39.     Except during pressure releases, the owner or operator of each pressure relief

device in gas/vapor service must operate the device with an instrument reading of less than 500

parts per million ("ppm") volatile organic compounds ("VOCs") above background.  40 C.F.R.

§ 63.165(a) (Subpart H); *id*. § 61.242-4(a) (Subpart V).

40.     The method for measuring emissions of VOCs from a pressure relief device is

Method 21, found in 40 C.F.R. Part 60, Appendix A.  40 C.F.R. § 63.180(c)(1) (Subpart H); *id*.

§ 61.245(c)(1) (Subpart V).

41.     Method 21, at 40 C.F.R. Part 60, Appendix A-7, Meth.21, Section 8.3.1, requires

the owner or operator of an affected source to do as follows:

> Place the probe inlet [of the portable instrument that is capable of detecting
> emissions from equipment] at the surface of the component interface where

leakage could occur.  Move the probe along the interface periphery while observing the instrument readout.  If an increased meter reading is observed, slowly sample the interface where leakage is indicated until the maximum meter reading is obtained.  Leave the probe inlet at this maximum reading location for approximately two times the instrument response time.  If the maximum observed meter reading is greater than the leak definition in the applicable regulation, record and report the results [as a leaking component].

42.     After each pressure release, a pressure relief device must be returned to a condition of no detectable emissions, as indicated by an instrument reading of less than 500 ppm VOCs above background, as soon as practicable, but no later than 5 calendar days after each pressure release.  40 C.F.R. § 63.165(b)(1) (Subpart H); *id.* § 61.242-4(b)(1) (Subpart V).

43.     Each owner or operator of a pressure relief device must keep a record of the dates and results of the monitoring following a pressure release.  40 C.F.R. § 63.181(f) (Subpart H); *see id.* § 61.246(e)(4) (Subpart V).

### c.     *Tank Standards of the OSWRO MACT*

44.     Owners and operators of tanks subject to the OSWRO MACT may choose among three options for compliance.  40 C.F.R. § 63.683(b)(1).  Of relevance to this Complaint, one of the compliance options is compliance with the specific standards for tanks found in the OSWRO MACT at 40 C.F.R. § 63.685.  *Id.* § 63.683(b)(1)(i).

45.     Under 40 C.F.R. § 63.685, an owner or operator of an existing tank must determine whether the capacity and vapor pressure of the tank requires the use of what are called "Tank Level 1 controls" or "Tank Level 2 controls."  *Id.* § 63.685(b)(1).  Table 3 of the OSWRO MACT provides a chart that identifies which tanks are subject to "Level 1" controls and which are subject to "Level 2" controls.  *Id.*

46.     Of relevance to this Complaint, tanks requiring Level 1 controls must comply with the standards in 40 C.F.R. § 63.685(c).  *Id.* § 63.685(b)(1).

47.     Under 40 C.F.R. § 63.685(c), owners and operators of tanks requiring Level 1 controls may choose among three options for compliance.  *Id*. § 63.685(c)(2).  Of relevance to this Complaint, one of the options is compliance with the "National Emissions Standards for Tanks—Level 1" at 40 C.F.R. Part 63, Subpart OO.  *Id.* §§ 63.900–63.908.  These regulations are commonly referred to as the "Level 1 Tank MACT" or "Subpart OO."

48.     Under the Level 1 Tank MACT standards applicable to fixed roof tanks, whenever regulated material is in a tank, the fixed roof must be installed with each closure device secured in the closed position, except for certain limited circumstances, including the two identified in Paragraphs 49 and 50 below.  *Id.* § 63.902(c).  A "closure device" is a cap, hitch, lid, plug, seal, valve, or other type of fitting that, when the device is secured in the closed position, prevents or reduces air emissions to the atmosphere by blocking an opening in a fixed roof.  *Id.* § 63.901.

49.     Under the Level 1 Tank MACT standards applicable to fixed roof tanks, opening of a spring-loaded pressure-vacuum relief valve, conservation vent, or similar type of pressure relief device which vents to the atmosphere is allowed during normal operations for the purpose of maintaining the tank internal pressure in accordance with the tank design specifications.  *Id.* § 63.902(c)(2).

50.     Under the Level 1 Tank MACT standards applicable to fixed roof tanks, opening of a safety device is allowed at any time conditions require it to do so to avoid an unsafe condition.  *Id.* § 63.902(c)(3).  A "safety device" is a pressure relief valve, frangible disc, fusible plug, or any other type of device which functions to prevent physical damage or permanent deformation to equipment by venting gases or vapors during unsafe conditions resulting from an unplanned, accidental, or emergency event.  *Id.* § 63.901.  For purposes of the Level 1 Tank

MACT, a safety device is not used for routine venting of gases or vapors from the vapor headspace underneath a tank's cover such as during filling of the unit or to adjust the pressure in this vapor headspace in response to normal daily diurnal ambient temperature fluctuations.  *Id.*

### 3. *Violation of the NESHAPs*

51.     After the effective date of any emission standard, limitation, or regulation promulgated pursuant to Section 112 of the CAA, no person may operate such source in violation of such standard, limitation, or regulation.  42 U.S.C. § 7412(i)(3).

### B. Enforcement of the CAA

52.     Section 113(a)(3) of the CAA, 42 U.S.C. § 7413(a)(3), authorizes EPA to bring a civil action if the Administrator of EPA finds that any person is in violation of, *inter alia*, any regulations promulgated under Section 112 of the CAA, 42 U.S.C. § 7412.

53.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes the Court to enjoin a violation, to require compliance, to assess and recover a civil penalty, and to award any other appropriate relief for each violation.

54.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes civil penalties of up to $25,000 per day for each violation of the CAA.

55.     The Civil Penalties Inflation Act of 1990, 28 U.S.C. § 2461 *et seq.*, as amended by the Debt Collection Improvements Act of 1996, 31 U.S.C. § 3701 *et seq.*, as amended by the Federal Civil Penalties Inflation Adjustment Improvement Act of 2015, 28 U.S.C. § 2461 note, Pub. L. 114-74, requires EPA to periodically adjust its civil penalties for inflation.  Pursuant to those statutory mandates, EPA has adopted and revised regulations entitled "Adjustment of Civil Monetary Penalties for Inflation," 40 C.F.R. Part 19, to upwardly adjust the maximum civil penalty under the CAA.  Of relevance to this Complaint, for each violation that occurred

between January 13, 2009, and November 2, 2015, inclusive, penalties of up to $37,500 per day may be assessed; and for each violation that occurs after November 2, 2015, where penalties are assessed on and after February 6, 2019, penalties of up to $99,681 per day may be assessed. 40 C.F.R. § 19.4.

## GENERAL ALLEGATIONS

56.     Clean Harbors Chicago is the "owner or operator," as defined in Section 112(a)(9) of the CAA, 42 U.S.C. § 7412(a)(9), of the Chicago Facility.

57.     Clean Harbors Ohio is the "owner or operator," as defined in Section 112(a)(9) of the CAA, 42 U.S.C. § 7412(a)(9), of the Hebron Facility.

58.     The Chicago Facility and the Hebron Facility each are a "major source" of HAPs, as defined in Section 112(a)(1) of the CAA, 42 U.S.C. § 7212(a)(1).

59.     The Chicago Facility and the Hebron Facility each engage in "waste management operations" that receive "off-site material," as defined in 40 C.F.R. § 63.681.

60.     The Chicago Facility and the Hebron Facility each are regulated as a treatment, storage and disposal facility under either 40 C.F.R. Part 264 or 265.

61.     The Chicago Facility and the Hebron Facility each are subject to the OSWRO MACT.

62.     The Chicago Facility and the Hebron Facility each have "tanks" and "equipment" within the meaning of the OSWRO MACT, as defined in 40 C.F.R. §§ 63.681 and 63.680(c)(3)(i)–(iii), respectively.

## CLAIMS

### CLAIM 1
**Violation of the OSRWO MACT (Subpart DD)**
**Clean Harbors Chicago:  Chicago Facility**
**Failure to Operate Pressure Relief Devices with Readings Less than 500 ppm VOCs**

63.     Plaintiff realleges and incorporates by reference Paragraphs 1–7, 10–56, and 58–62 as if fully set forth herein.

64.     At the Chicago Facility, Clean Harbors Chicago owns and operates approximately 53 above-ground storage tanks that are equipped with pressure relief devices that are in gas/vapor service.

65.     The pressure relief devices on the tanks are "equipment" within the meaning of the OSWRO MACT.

66.     On May 26, 2017, EPA recorded instrument readings from the pressure relief devices on Tanks 33, 34B, 36, 37A, and 40B at the Chicago Facility of greater than 500 ppm VOCs above background.

67.     During the readings, the tanks were not releasing pressure to avoid an unsafe condition or to maintain the tanks' internal pressure in accordance with the tanks' design specifications.

68.     On information and belief, these pressure relief devices were leaking VOCs at a concentration greater than 500 ppm before May 26, 2017, at times when the tanks were not releasing pressure to avoid an unsafe condition or to maintain the tanks' internal pressure in accordance with the tanks' design specifications.

69.     Based on the acts and omissions referenced in this Claim, on numerous occasions between at least 2014 and May 26, 2017, Clean Harbors Chicago failed to operate each pressure relief device in gas/vapor service with an instrument reading of less than 500 ppm VOCs above

background at times when the tanks associated with the pressure relief devices were not releasing pressure to avoid an unsafe condition or to maintain the tanks' internal pressure in accordance with the tanks' design specifications, in violation of Section 112 of the CAA, 42 U.S.C. § 7412, and the implementing regulations at 40 C.F.R. § 63.691(b); and *id.* § 63.165(a) (Subpart H) and § 61.242-4(a) (Subpart V).

70.     Unless restrained by an Order of the Court, these violations of the CAA and its implementing regulations are likely to recur.

71.     For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, as amended, Clean Harbors Chicago is subject to injunctive relief, including mitigation of the effects of excess emissions, and civil penalties of up to $37,500 per day for each violation between January 12, 2009, and November 2, 2015; and up to $99,681 per day for each violation after November 2, 2015.

**CLAIM 2**
**Violation of the OSRWO MACT (Subpart DD)**
**Clean Harbors Chicago:  Chicago Facility**
**Failure to Perform Method 21 Correctly;**
**<u>Failure to Return Pressure Relief Devices to a Condition of No Detectable Emissions</u>**

72.     Plaintiff realleges and incorporates by reference Paragraphs 1–7, 10–56, and 58–71 as if fully set forth herein.

73.     For the five years between 2014 and 2018, the tanks at the Chicago Facility released VOCs through the tanks' pressure relief devices, including (but not limited to) VOCs released during and after pressure release events.

74.     For the five years between 2014 and 2018, Clean Harbors Chicago recorded no VOC concentrations above 500 ppm from any of the pressure relief devices on the 53 above-ground storage tanks at the Chicago Facility.

75.     On May 26, 2017, EPA recorded leaks above 500 ppm VOCs above background from the pressure relief devices of 5 tanks.  This represents leaking pressure relief devices on approximately 10 percent of the total pressure relief devices on the tanks at the Chicago Facility.

76.     Based on the acts and omissions referenced in this Claim and on information and belief, on numerous occasions between at least 2014 and 2018, Clean Harbors Chicago failed to perform Method 21 monitoring correctly for the pressure relief devices on the tanks at the Chicago Facility, in violation of Section 112 of the CAA, 42 U.S.C. § 7412, and the implementing regulations at 40 C.F.R. § 63.691(b); *id.* § 63.180(c)(1) (Subpart H) and § 61.245(c)(1) (Subpart V); and 40 C.F.R. Part 60, Appendix A-7, Meth.21, Section 8.3.1.

77.     Based on the acts and omissions referenced in this Claim and on information and belief, on numerous occasions between 2014 and 2018, Clean Harbors Chicago failed to return pressure relief devices to a condition of no detectable emissions as indicated by an instrument reading of less than 500 ppm VOCs above background, as soon as practicable, but no later than 5 calendar days after each pressure release, in violation of Section 112 of the CAA, 42 U.S.C. § 7412, and the implementing regulation at 40 C.F.R. § 63.691(b); and *id.* § 63.165(b)(1) (Subpart H) and § 61.242-4(b)(1) (Subpart V).

78.     Unless restrained by an Order of the Court, these violations of the CAA and its implementing regulations are likely to recur.

79.     For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, as amended, Clean Harbors Chicago is subject to injunctive relief, including mitigation of the effects of excess emissions, and civil penalties of up to $37,500 per day for each violation between January 12, 2009, and November 2, 2015; and up to $99,681 per day for each violation after November 2, 2015.

**CLAIM 3**
**Violation of the OSWRO MACT (Subpart DD)**
**Clean Harbors Chicago: Chicago Facility**
**Failure to Maintain Records**

80.     Plaintiff realleges and incorporates by reference Paragraphs 1–7, 10–56, and 58–79 as if fully set forth herein.

81.     Based on the acts and omissions referenced in Claim 2 and on information and belief, on numerous occasions between at least 2014 and 2018, Clean Harbors Chicago failed to keep a record of the dates and results of Method 21 monitoring following a pressure release, in violation of Section 112 of the CAA, 42 U.S.C. § 7412, and the implementing regulation at 40 C.F.R. § 63.691(b); and *id.* § 63.181(f) (Subpart H) and § 61.246(e)(4) (Subpart V).

82.     Unless restrained by an Order of the Court, these violations of the CAA and its implementing regulations are likely to recur.

83.     For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, as amended, Clean Harbors Chicago is subject to injunctive relief, including mitigation of the effects of excess emissions, and civil penalties of up to $37,500 per day for each violation between January 12, 2009, and November 2, 2015; and up to $99,681 per day for each violation after November 2, 2015.

**CLAIM 4**
**Violation of the OSRWO MACT (Subpart DD)**
**Clean Harbors Ohio: Hebron Facility**
**Failure to Maintain Closure Devices on Tanks in the Closed Position**

84.     Plaintiff realleges and incorporates by reference Paragraphs 1–5, 8–55, and 57–62 as if fully set forth herein.

85.     At the Hebron Facility, Clean Harbors Ohio owns and operates approximately 94 above-ground storage tanks.

86.     Each of these tanks has a fixed roof.

87.     Each of these tanks has either:  (i) a design capacity less than 75 cubic meters ("m³") (approximately 19,800 gallons) and a maximum HAP vapor pressure less than 76.6 kilopascals ("kPa") (approximately 11.1 pounds per square inch atmosphere ("psia")); or (ii) a design capacity equal to or greater than 75 m³ and less than 151 m³ (approximately 39,864 gallons) and a maximum HAP vapor pressure less than 27.6 kPa (approximately 4 psia).

88.     Each of these tanks is required to be controlled under the tank standards of the OSWRO MACT.

89.     Each of these tanks is subject to Level 1 controls.

90.     Pursuant to the options available under the OSWRO MACT, Clean Harbors Ohio elected to comply with the tank standards of the OSWRO MACT by complying with the Level 1 Tank MACT (*i.e.*, Subpart OO).

91.     Each of the roofs of the tanks at the Hebron Facility is equipped with a loose-bolt manhole cover.  Each loose-bolt manhole cover is a "closure device" within the meaning of the Level 1 Tank MACT.

92.     Clean Harbors Ohio purported to use each loose-bolt manhole cover as a "safety device" within the meaning of the Level 1 Tank MACT.

93.     On July 14, 2016, EPA recorded instrument readings ranging between 4 ppm VOCs and more than 2000 ppm VOCs from the loose-bolt manhole covers on 22 of the 94 tanks at the Hebron Facility.

94.     At the time of EPA's monitoring, the 22 tanks had regulated materials in them.

95.     At the time of EPA's monitoring, the manholes on the 22 tanks were not functioning as safety devices venting gases or vapors to avoid an unsafe condition.

96. On October 4, 2018, EPA recorded instrument readings of between 677 ppm and 1700 ppm from the loose-bolt manhole covers on 4 of 20 tanks at the Hebron Facility.

97. At the time of EPA's monitoring, the 4 tanks had regulated materials in them.

98. At the time of EPA's monitoring, the manholes on the 4 tanks were not functioning as safety devices venting gases or vapors to avoid an unsafe condition.

99. On information and belief, prior to, between, and after the EPA's monitoring on July 14, 2016, and October 4, 2018, the loose-bolt manhole covers on the roofs of the tanks at the Hebron Facility were leaking VOCs at times when the manhole covers were not functioning as safety devices venting gases or vapors to avoid an unsafe condition.

100. Based on the acts and omissions in this Claim, on numerous occasions between at least 2014 and 2018, Clean Harbors Ohio failed to secure each loose-bolt manhole cover on the tanks at the Hebron Facility in a closed position during times when the opening of the loose-bolt manhole cover was not permitted, in violation of Section 112 of the CAA, 42 U.S.C. § 7412, and the implementing regulations at 40 C.F.R. §§ 63.685(c) and 63.902(c).

101. Unless restrained by an Order of the Court, these violations of the CAA and its implementing regulations will continue.

102. For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, as amended, Clean Harbors Ohio is subject to injunctive relief, including mitigation of the effects of excess emissions, and civil penalties of up to $37,500 per day for each violation between January 12, 2009, and November 2, 2015; and up to $99,681 per day for each violation after November 2, 2015.

## CLAIM 5
### Violation of the General Provisions of the MACT Standards (Subpart A)
### Clean Harbors Ohio:  Hebron Facility
### Failure to Operate Tanks in a Manner Consistent with
### Good Air Pollution Control Practices

103.    Plaintiff realleges and incorporates by reference Paragraphs 1–5, 8–55, 57–62, and 84–102 as if fully set forth herein.

104.    Good air pollution control practices for minimizing emissions from tanks involves, *inter alia*, ensuring that a safety device on a tank is set to open at a pressure higher than the pressure-relief-vacuum vent on that same tank.  Good air pollution control practices also requires undertaking periodic monitoring and inspecting of a tank's safety device to ensure that the safety device is in a closed position at all times except to avoid an unsafe condition.

105.    For the period between at least 2014 and September 2017, the pressure set point for the loose-bolt manhole covers on the roofs of the tanks at the Hebron Facility was lower than the pressure set point for the pressure-relief-vacuum vents on those tanks.

106.    For the period between at least 2014 and September 2017, Clean Harbors Ohio recorded no leaks from either the loose-bolt manhole covers of its tanks or the pressure-relief-vacuum vents when, on at least July 14, 2016, there were leaks, and when, on information and belief, there were leaks before and after July 14, 2016, as well.

107.    Based on the acts and omissions referenced in this Claim and Claim 4, for the period between at least 2014 and September 2017, Clean Harbors Ohio failed to operate and maintain its tanks in a manner consistent with safety and good air pollution control practices for minimizing emissions, in violation of Section 112 of the Clean Air Act and its implementing regulation at 40 C.F.R. § 63.6(e)(1)(i).

108. For the violations asserted in this Claim, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, as amended, Clean Harbors Ohio is subject to injunctive relief, including mitigation of the effects of excess emissions, and civil penalties of up to $37,500 per day for each violation between January 12, 2009, and November 2, 2015; and up to $99,681 per day for each violation after November 2, 2015.

## PRAYER FOR RELIEF

Wherefore, based on the allegations set forth above, the United States requests that this Court:

1. Permanently enjoin Clean Harbors Chicago and Clean Harbors Ohio from operating the Chicago Facility and the Hebron Facility, respectively, except in accordance with the CAA and all applicable federal regulations and applicable federally enforceable state regulations.

2. Order Clean Harbors Chicago and Clean Harbors Ohio to operate the Chicago Facility and the Hebron Facility, respectively, in compliance with the CAA statutory and regulatory requirements set forth herein.

3. Order Clean Harbors Chicago and Clean Harbors Ohio to take other appropriate actions to remedy, mitigate, and offset the harm to public health and the environmental caused by the violations of the CAA alleged herein.

4. Assess a civil penalty against Clean Harbors Chicago and Clean Harbors Ohio of up to $37,500 per day for each violation between January 13, 2009 and November 2, 2015; and up to $99,681 per day for each violation after November 2, 2015.

5.      Award the United States its costs in this action; and

6.      Grant such other relief as the Court deems just and proper.

Respectfully Submitted,

FOR THE UNITED STATES OF AMERICA

KAREN S. DWORKIN
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice

Dated:  July 11, 2019        s/ Randall M. Stone
                                 RANDALL M. STONE
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
Telephone:  202 514-1308
Fax:  202 616-6584
randall.stone@usdoj.gov

JOHN R. LAUSCH, JR.
United States Attorney
Northern District of Illinois

NIGEL B. COONEY
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
Telephone:  312 353-1996
nigel.cooney@usdoj.gov

<u>OF COUNSEL:</u>

Christopher Grubb
Associate Regional Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency, Region 5
77 W. Jackson Blvd.  C-14J
Chicago, IL  60604